*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DUKE S., | ) |
| | ) Supreme Court No. S-16932 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-14-00311 CN |
| v. | ) |
| | ) **O P I N I O N** |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF HEALTH & | ) No. 7317 – November 16, 2018 |
| SOCIAL SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. David T. Jones, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and Chad Holt, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

The superior court terminated a father's parental rights to his son, finding that the child was in need of aid because of abandonment, neglect, and the father's incarceration and that the Office of Children's Services (OCS) had satisfied its statutory obligation to make reasonable efforts to reunify parent and child. The father appeals the termination decision, arguing that these findings are unsupported by the evidence.

We agree with the father. The record shows that he initiated efforts to visit the child, who was already in OCS custody, as soon as he learned of his possible paternity; that during the father's subsequent incarceration he had visitation as often as OCS was able to provide it; and that OCS never created a case plan to direct the father's efforts toward reunification. We conclude that it was clear error to find that the child was in need of aid and that OCS made reasonable efforts toward reunification, and we therefore reverse the termination decision.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Duke S. and Evangeline G. had an "on and off" relationship for nearly a decade and are the parents of Darrence G., born in April 2014.[1] OCS's concerns about Darrence began before he was born: a hospital social worker contacted OCS in January 2014 when Evangeline, then pregnant, tested positive for cocaine and THC. On the day Darrence was born, Evangeline, against medical advice, took him from the hospital after refusing any laboratory work on herself or the baby. But the hospital tested the umbilical cord blood and found it positive for cocaine and THC. These test results, and Evangeline's failure to return for scheduled pediatric appointments, prompted the hospital to contact OCS.

---

[1]    We use pseudonyms to protect the privacy of the parties.

Evangeline resisted OCS's efforts to investigate its concerns, but OCS prepared a series of safety plans that required, among other things, that Evangeline submit to random urinalysis (UA) testing. She failed to cooperate during her first UA appointment and missed the next two months of appointments. She did, however, bring Darrence in for a hair follicle test in June, which was positive for methamphetamine.

After receiving the test results, OCS attempted to take emergency custody of Darrence. But Evangeline refused to disclose the child's whereabouts despite a search warrant, a court order, and a writ of assistance. It was about ten days later that the police found Darrence and arrested Evangeline on charges of custodial interference. OCS authorized both a UA and a hair follicle test on the child, getting positive results for a variety of illegal substances.

OCS developed a case plan for Evangeline, but she failed to follow it. In September she was sentenced on a theft charge and served time in prison and a halfway house; she was released in early December 2014.

Duke had been unaware of Evangeline's pregnancy until that September. He found out about Darrence's existence after seeing Evangeline on television and talking with her mother. At the time, Duke was a single father and the primary caregiver for four of his eight children, three of whom had been born prematurely and had special needs. In September, "trying to get involved immediately," Duke went to the OCS office, announced that he could be Darrence's father, and asked for paternity testing. He later testified that he sat in OCS's lobby with his daughter for three or four hours before he left, "went to the child support office," and "ask[ed] for a DNA test" there. OCS later sent Duke the paternity paperwork.

Before taking the paternity test, Duke met with Evangeline to "talk[] about the child" and the ongoing OCS proceedings. When Evangeline showed him pictures of Darrence, Duke felt immediately that "[t]his is one of my children." He and

Evangeline went to the Bureau of Vital Statistics and "created [Darrence's] birth certificate together . . . [b]ecause [Duke] knew that [Darrence] was [his] son."

In October OCS placed Darrence with Siri M. Evangeline knew Siri before OCS took custody, and it was at her request that, after OCS took custody, Siri got an emergency foster care license so she could be considered as a placement for Darrence. Darrence remained in Siri's care throughout the underlying proceedings.

In early November Duke went to OCS's offices and completed the paternity testing. Two weeks later, the test results confirmed he was Darrence's father.

By this time OCS had received at least two protective services reports involving Duke and his other children, in October and November 2014, and OCS was conducting a safety assessment of his home. As of January 2015, OCS had received five protective services reports concerning Duke and three of his children, had "had at least five to ten conversations" with Duke about them, and was still gathering information about Duke's family. The protective services reports involved possible educational neglect, medical neglect, Duke's angry outbursts with school staff, and one child's behavior in school. While the reports were never substantiated and OCS did not have any CINA cases involving Duke's other children, OCS put off deciding whether to place Darrence in Duke's care.

Duke asked OCS for visitation with Darrence for Thanksgiving 2014. OCS denied his request, apparently because of the outstanding protective services reports. Duke met Darrence for the first time in December, when he accompanied Evangeline to one of her scheduled visits at OCS's offices.

The adjudication trial for Darrence was initially set for December 2, 2014, but the court granted a brief continuance at Evangeline's request. Duke appeared in court that day; he acknowledged receiving OCS's amended petition for adjudication, said

he intended to participate in the proceedings, declined representation, and said he was prepared to go forward.

## B. The Adjudication Trial

The adjudication trial occurred over six days between December 2014 and February 2015. Both Evangeline and Duke represented themselves. Duke attended only four days of the trial, showing up late each time; he concedes that he "took a back seat" role during this proceeding.[2]

OCS's evidence at the adjudication trial mostly concerned Evangeline. She called Duke as a witness, however, and he testified that OCS had ignored his overtures, that Darrence's caseworker failed to contact him after confirming his paternity or establish a visitation plan despite promising to work on it, and that he believed OCS had no intention of reunifying him with his son.

The superior court found by clear and convincing evidence that Darrence was a child in need of aid due to abandonment, physical harm, neglect, and substance abuse.[3] The court also found that OCS had made reasonable but unsuccessful efforts to prevent Darrence's removal from the family home. Though stating that OCS's efforts had been unsuccessful "through no fault of OCS but rather through [Evangeline's] and [Duke's] actions and inactions," the court made no specific findings about Duke; its findings focused on the conduct of Evangeline.

---

[2]     When the court asked Duke whether he had questions for OCS's second witness, Duke replied that he was "just listening for now" and agreed to let the court know if he wanted to ask questions. He ultimately declined the court's offer to present his own evidence.

[3]     AS 47.10.011(1), (6), (9), and (10).

## C. The Period Between Adjudication And Termination

Over the next few months, Duke was able to visit with Darrence several times. While only one visitation was "sanctioned and coordinated via OCS," Duke had at least two others in December and January, when he accompanied Evangeline to her scheduled visits at OCS's offices. In February 2015 Duke asked Siri if he could have an in-home visit, but Siri told him he would "have to coordinate that with [OCS]."

In April 2015 Duke was arrested on charges of first-degree sexual assault stemming from a 2011 accusation by the sister of his deceased fiancée. OCS took custody of the four children who were then living with him. Unable to make bail, Duke remained incarcerated until after his trial in April 2018, when he was acquitted.

In March 2016 Darrence received a neurodevelopmental evaluation which indicated that he was autistic; delayed in his verbal, social, and fine motor skills; and needed "a stable, able, attentive, long-term home environment." It is uncontested that Darrence had significant needs and that his foster mother Siri and her family provided him with more than adequate care during his placement with them.

After his arrest Duke asked OCS to place Darrence and the four children in his household with his sister, Natalya S., who at the time was a licensed foster care provider. OCS denied the request as to Duke's other four children but did not address it as to Darrence until over a year later, when it denied the request on the same ground: that Natalya first needed to "demonstrate that she could meet [Darrence's] specialized needs by attending his weekly therapy sessions." Natalya apparently did not follow up. The mother of Duke's eldest son took him to her home out of state, and OCS placed the other two boys with their maternal grandmother and placed Duke's daughter in a foster home.

During Duke's incarceration he had perhaps five visits with Darrence, spread out from August 2016 to September 2017. Siri also made efforts to maintain

familial bonds between Darrence and Duke's other children. She informed OCS of her efforts but did not know what became of the information.

A new OCS caseworker took over Darrence's case in August 2016. Asked about her efforts to work with Duke, she testified that she "communicated with [OCS's] family contact team to ensure that he was getting his quarterly visits with [Darrence]"; sent Duke "some correspondence regarding [Darrence]'s needs," including a medical consent form for the anesthesia required for a "special hearing test"; and "had one in-person meeting . . . at the Anchorage jail" on February 3, 2017, when she brought Darrence for a visit. She testified that during the visit she and Duke talked about Darrence and the services Darrence was getting but "didn't really talk a whole lot about" Duke's case plan or its objectives. She testified that quarterly visits were all OCS could offer incarcerated parents "based on the staff we have" and that an incarcerated parent's frequent moves between correctional facilities "could be a barrier to getting [visitation]." She testified that OCS attempted quarterly visits for Duke with Darrence and that she "believe[d] [Duke had] been receiving [visits] quarterly"; however, she could personally identify only two visitation dates and conceded that she did not "have concrete proof" that quarterly visits otherwise occurred. Duke denied that he received quarterly visits.

The record contains no case plan addressing Duke's potential reunification with Darrence.[4] The caseworker testified about her concerns with Duke's parenting and what *would* be in Duke's case plan if he had one. She testified that she and Duke "would need to case plan together" and that she "would definitely recommend on his case plan that [Duke] cooperate with a psychological assessment," "that he engage fully with

---

[4] While questioning the caseworker, Duke referred to a case plan pertaining to three of his other children and said, "[T]his is the same information on the document for [Darrence]." The record does not disclose what document he was referring to; OCS does not contend there was a case plan focused on reunifying him with Darrence.

[Darrence's] services," and that he have "a parent coach." When Duke asked the caseworker whether she thought he was "ready, willing, and able to . . . do the case plan and reunite with [his] son," she replied, "That is something I haven't had the opportunity to assess, because you've been incarcerated the duration that I've had this case."

During Duke's incarceration, and on his own volition, he completed an InsideOut Dad parenting class, took classes on using computers and building a business, was trained and certified as a forklift operator, and participated in a Christian correspondence program that he testified met his spiritual, mental, and psychological needs. He testified that he was about to start the "criminal attitude program" and would take "every other program that they have [that is available] to me" before his release.

OCS filed a petition to terminate Duke's parental rights to Darrence in June 2017, and a trial was held over two days in December 2017. The trial involved only Duke's rights, not Evangeline's, because OCS anticipated that she would consent to an adoption. Duke was transported to the courthouse and attended both days of the trial, representing himself. OCS called two witnesses, Siri and the OCS caseworker then assigned to Darrence. Duke was the sole witness for himself.

The court placed its decision on the record at the close of trial, finding that OCS had met its burden of proof for terminating Duke's parental rights to Darrence. The court found that OCS "met its burden . . . by clear and convincing evidence that the child has been subjected to conditions or conduct described in each of the three subsections alleged by the state, AS 47.10.011(1), (2), and (9)": abandonment, incarceration, and neglect. The court found by clear and convincing evidence that Duke had not remedied the conduct or conditions that placed Darrence at risk: the court found this element was "easily met by the fact that you're in jail, have been for a long time, and that you haven't taken those steps to provide for the child or to protect the child and that the child's very much at risk." The court found by clear and convincing evidence that OCS made

"reasonable efforts trying to get [Duke] involved in a plan and visitation" but that its "various efforts were met with less than adequate participation by [Duke] to engage in the plan or program and to take those steps to reunite." Finally, the court found that OCS had "proven by a preponderance of the evidence that termination of parental rights is in the best interests of the child" because of Darrence's needs for special care and permanency. The court signed a written order the same day summarizing its conclusions of law based on the factual findings made on the record.

Duke appeals.

## III. STANDARDS OF REVIEW

Whether a child is in need of aid is a factual determination,[5] and "[w]hether OCS has made reasonable reunification efforts is a mixed question of law and fact."[6] We review factual findings in CINA cases for clear error,[7] and "[w]e apply our independent judgment to questions of law."[8] "Whether the superior court's factual findings satisfy applicable [CINA] statutes and rules is a question of law that we review de novo."[9]

## IV. DISCUSSION

### A. The Finding That Darrence Was A Child In Need Of Aid Is Clearly Erroneous.

Before terminating parental rights, the superior court must "find by clear

---

[5] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013).

[6] *Id.* at 949.

[7] *Id.*

[8] *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008).

[9] *Sherman B.*, 310 P.3d at 949 (quoting *M.W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 20 P.3d 1141, 1143 (Alaska 2001)).

and convincing evidence that the child 'has been subjected to conduct or conditions described in AS 47.10.011' and is thus in need of aid."[10] The superior court found that Darrence was a child in need of aid on three grounds: abandonment,[11] Duke's incarceration,[12] and neglect.[13] A finding of CINA status under just one statutory subsection is enough to support termination.[14] But we conclude that the evidence does not support CINA status under any one of the three on which the superior court relied.

### 1.    Abandonment

Abandonment will support a CINA finding if "a parent . . . has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid."[15] Duke does not dispute that Evengeline was absent. Our focus, therefore, is on whether it was clear error to find that Duke "abandoned the child as described in AS 47.10.013."

A "court may find abandonment of a child if a parent . . . has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[16] "The statute also provides specific

---

[10]    *Id.* (quoting AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A)).

[11]    AS 47.10.011(1).

[12]    AS 47.10.011(2).

[13]    AS 47.10.011(9).

[14]    *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 643 (Alaska 2013).

[15]    AS 47.10.011(1).

[16]    AS 47.10.013(a).

examples of conduct that will be considered abandonment."[17]  Here, the superior court relied on AS 47.10.013(a)(2), (3), and (4), which provide that abandonment includes "instances when the parent . . . , without justifiable cause,"

> (2) has made only minimal efforts to support and communicate with the child; (3) failed for a period of at least six months to maintain regular visitation with the child; [or] (4) failed to participate in a suitable plan or program designed to reunite the parent or guardian with the child[.]

We conclude that the evidence does not support an abandonment finding under any of these illustrations.

From the time Duke learned of his possible paternity to the time he was incarcerated, he showed his willingness to care for Darrence (though OCS's concern about the protective services reports apparently prevented Darrence's placement with him).  Duke voluntarily came forward as the potential father, sought out paternity testing, and helped Evangeline amend Darrence's birth certificate to show his paternity even before genetic testing had confirmed it.  He sought visitation with Darrence, accompanied Evangeline to OCS so he could meet Darrence, and asked Siri for in-home visitation.  He attended the adjudication trial.

Once Duke was incarcerated, his direct interaction with Darrence was necessarily limited.  But OCS never alleged that he failed to provide reasonable support during that time.  And OCS asserted that it provided all the visitation its resources allowed, thus conceding that Duke did not "fail[] for a period of at least six months to maintain regular visitation with the child."[18]  Duke asserted that while in prison he "never

---

[17]     *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 651 (Alaska 2003) (citing AS 47.10.013(a)(1)-(8)).

[18]     AS 47.10.013(a)(3).

forgot about [his] kids" and sent them letters and pictures through OCS; OCS did not dispute this.

As its "main" justification for the abandonment finding, the superior court identified Duke's failure to "participate in a suitable plan or program designed to reunite the parent . . . with the child." It specifically found that "OCS's various efforts were met with less than adequate participation by [Duke] to engage in the plan or program and to take those steps to reunite." But the record contains no case plan addressing Duke's potential for reunification with Darrence, and OCS's caseworker appeared to concede at trial that one did not exist. This was a significant lapse. By statute, OCS's "duty to make reasonable efforts . . . includes the duty to . . . identify family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid" and "actively offer . . . and refer the parent" to those services.[19]

In *Frank E. v. State, Department of Health & Social Services, Division of Family & Youth Services*, as here, the father was incarcerated during a significant part of the State's involvement with his children;[20] the State did create a case plan, but it involved treatment and classes "that could only be taken after his release from incarceration," which was scheduled to occur after the termination trial.[21] We held that "the state's failure to identify and offer programs to [the father] before the planned termination would generally violate the state's duty under AS 47.10.086," but "the failure was harmless in this case because the superior court continued the . . . termination

---

[19]    AS 47.10.086(a)(1), (2).

[20]    77 P.3d 715, 716 (Alaska 2003).

[21]    *Id.*

trial specifically to allow [the father] an opportunity to complete his case plan."[22]  In other cases, when preparation of a case plan was unreasonably delayed, we have still affirmed reasonable efforts determinations made on the basis of OCS's involvement with the family in its entirety.[23]  But we have never excused OCS's failure to create any case plan at all.[24]

Here the evidence is undisputed that OCS did not create a relevant case plan for Duke, did not engage him in case planning, and during the 17 months before the termination trial met with him in person only once, when there was no significant discussion of a case plan or its possible objectives.  We cannot affirm a finding that Duke failed to participate in a case plan that did not exist on paper and was not even explained to him in theory.  The superior court's abandonment findings are clearly erroneous and cannot form the basis for a determination that Darrence was a child in need of aid.

### 2.  Neglect

Neglect may be the basis for a CINA finding if "conduct by or conditions created by the parent . . . have subjected the child or another child in the same household to neglect."[25]  "[T]he court may find neglect of a child if the parent . . . fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care

---

[22]     *Id.* at 720.

[23]     *See Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 844-45, 849-50 (Alaska 2009) (case plan not developed until almost two years after OCS assumed custody of children).

[24]     The record implies the existence of case plans involving Duke's other children; his caseworker's testimony about Duke's need for a psychological assessment apparently addressed a requirement of those plans.  But reference to those plans appears in the trial transcript only through Duke's questions about them when he was cross-examining the caseworker; they were not in evidence.

[25]     AS 47.10.011(9).

and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial or other reasonable means to do so."[26]

We conclude that the evidence does not support a finding of CINA status based on neglect for two reasons. First, Darrence was in foster care with Siri's family from the time Duke learned of his existence through trial, and there was therefore no time when Duke was responsible for Darrence's care and failed to provide it. Second, to the extent Duke remained responsible for Darrence's support, there was no evidence he was financially able to provide more than he did.

When a child is committed to OCS's care following an adjudication hearing under AS 47.10.080(c)(1), "a relationship of legal custody exists" which "imposes on the department . . . the responsibility of physical care and control of the child, the determination of where and with whom the child shall live, the right and duty to protect, nurture, train, and discipline the child, the duty of providing the child with food, shelter, education, and medical care, and the right and responsibility to make decisions of financial significance concerning the child."[27] The parent's responsibilities at that point are the "residual" ones identified in AS 47.10.084(c), which as relevant here include "the . . . responsibility of reasonable visitation" and "the responsibility for support."

With regard to visitation, the evidence does not support a finding that Duke failed in his responsibility; as described above, he sought visitation as soon as he learned of his possible paternity and exercised it in prison as often as OCS was able to provide

---

[26]     AS 47.10.014.

[27]     AS 47.10.084(a).

it.[28]  As for "the responsibility for support," the day-to-day responsibility for Darrence's care was reposed by law in OCS and delegated to Siri.[29]  To the extent Duke remained responsible for financial support, he testified that he was "still paying child support while in custody," which OCS did not dispute.  Furthermore, OCS had the burden of proving that Duke failed to provide support "*though financially able to do so*."[30]  The evidence at trial showed that Duke was incarcerated and unable to post bail; he testified that he had saved up $10,000 toward his bail but "one of [his] third parties . . . ran off with [his] money."  In prison he earned 50 cents an hour when he worked, for a total of perhaps "18 to $20 a week."  We see no basis in the record for a finding that Duke failed to provide support that he was financially able to provide.[31]

We conclude that it was clear error to find that Duke's neglect caused Darrence to be a child in need of aid.

### 3.    Incarceration

A parent's incarceration may be the basis for a CINA finding if "a parent . . . is incarcerated, the other parent is absent or has committed conduct or created

---

[28]    The OCS caseworker who testified at the termination trial conceded that a paucity of visitation due to OCS's overstretched resources "may feel like a punishment to the parents" but did not amount to "neglect to the kids, no."

[29]    AS 47.10.084(a) (setting out OCS's responsibilities to child in its custody and its power to delegate them).

[30]    AS 47.10.014 (emphasis added).

[31]    OCS also argues that neglect may be found in Duke's "refus[al] to sign the consent forms" necessary for Darrence's tonsillectomy and adenoidectomy "without altering them."  According to OCS, Duke signed the consent forms but "crossed off the line that stated the doctor is not responsible for anything that might go wrong during surgery."  The superior court made no findings about this incident, so we need not decide whether it would be sufficient by itself to justify a finding of neglect.

conditions that cause the child to be a child in need of aid . . . , and the incarcerated parent has not made adequate arrangements for the child."[32]  Duke does not dispute that he was incarcerated, nor does he contest the court's finding that Evangeline committed conduct or created conditions that caused Darrence to be in need of aid.  Duke contests only the finding that while incarcerated he failed to make adequate arrangements for Darrence.

We agree with Duke that the record does not support that finding.  Darrence had been placed in the care of Siri, whom Evangeline personally selected to care for him, in October 2014, a month before Duke's paternity was confirmed.  She was still caring for Darrence at the time of the termination trial and testified that she was "absolutely" willing to continue doing so.  OCS had no question about the adequacy of this arrangement:  in closing argument its counsel said that Darrence was "very fortunate to have the foster parents that he has who are able to provide him with the day-to-day supervision that he needs, who are able to get him to all the appointments that he has to go to, to receive all the services that he needs, and who are willing to provide that care for him long term."   In short, though Siri was not *Duke's* choice for Darrence's caregiver, there was no question but that he left Darrence in good care when he went to prison.

It is true, as OCS argues, that Duke's own choice did not work out.  After he was arrested in April 2015, Duke asked OCS to place his children with his sister Natalya, who was a licensed foster care provider.  The court found that OCS denied the request as to Darrence because Natalya had lost her foster care license and also because Darrence "just has such extraordinarily high needs."  But the determination that Natalya could not meet Darrence's special needs was not made until over a year after Duke made

---

[32]  AS 47.10.011(2).

his placement request, when the new caseworker took over his file in August 2016. The new caseworker denied his request based on an earlier determination that Natalya could not meet the special needs of the other four children who had been living with Duke at the time of his arrest — and "pending her ability to demonstrate that she could meet [Darrence's] specialized needs by attending his weekly therapy sessions," which apparently did not occur. According to the caseworker, Natalya lost her foster care license nearly a year later, in June 2017; the loss of her license played no part in OCS's decision to deny Duke's placement request.

Assuming that Natalya was indeed an inappropriate placement at the time of OCS's denial, we still cannot conclude that the evidence supported a finding that Duke failed to make "adequate arrangements for the child." His request that Darrence be placed with Natalya, a licensed foster care provider, was pending for over a year before OCS denied it. There was no evidence that OCS, having finally sent Natalya a denial, informed Duke of its action and asked him to provide other names; placement was not among the limited topics OCS's caseworker described raising with Duke while he was incarcerated.[33]

---

[33] The caseworker testified that "we just talked a little bit about [Darrence's] services that he was in. We didn't really talk a whole lot about case plan specific object or objectives. It was more just about [Darrence]." In *Josh L. v. State, Department of Health & Social Services, Office of Children's Services*, the dissent noted that "[a]lthough we do not need to decide the question here, it is difficult to believe that in the non-ICWA context OCS's reasonable efforts duty does not include assisting an incarcerated parent in remedying the lack of an alternative placement for a child when the parent provides the names of potential placements." 276 P.3d 457, 471 (Alaska 2012) (Winfree, J., dissenting). We need not decide the issue here either, but we note that the record is bare of any indication that OCS even informed Duke of the status of his effort to make "adequate arrangements for [the] child," thus prompting him to make another suggestion.

We conclude that it was clear error to find that Darrence was a child in need of aid on grounds that Duke, when incarcerated, failed to make adequate arrangements for his care. Because we cannot affirm any of the court's three findings supporting CINA status, we reverse its decision that Darrence was a child in need of aid.

**B. The Superior Court Clearly Erred In Determining That The State Made Reasonable Efforts To Reunify The Family.**

Termination of parental rights is also predicated on a finding, by clear and convincing evidence, "that OCS made timely, reasonable efforts to provide family support services designed to prevent out-of-home placement or enable the child's safe return to the family home."[34] "By statute, OCS's duties include the duty to: (1) identify family support services that will assist the parent in remedying [his or] her conduct; (2) actively offer those services to the parent and refer the parent to them; and (3) document the department's actions."[35] "The requirement that OCS offer reunification services 'is fulfilled by setting out the types of services that a parent should avail . . . [himself] of in a manner that allows the parent to utilize the services.' "[36] Duke contends that OCS's efforts to reunify him and Darrence were "virtually non-existent."

Because we are reversing the superior court's finding that Darrence was a child in need of aid, we need not review OCS's remedial efforts in detail. But we do note the insufficiency of the evidence supporting the superior court's conclusion that OCS made "reasonable efforts trying to get [Duke] involved in a plan and visitation." As

---

[34]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[35]     *Id.* (citing AS 47.10.086(a)).

[36]     *Id.* (alteration in original) (quoting *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 (Alaska 2008)).

explained above, there *was* no case plan directed toward reunifying Duke and Darrence; that omission itself may be fatal to a reasonable efforts finding.[37]

As for visitation, Duke initiated it in late 2014 and early 2015, and once he was incarcerated visitation occurred as often as OCS was able to facilitate it. We have noted that "the scope of OCS's duty to make reasonable efforts is affected by a parent's incarceration,"[38] and that efforts by the Department of Corrections count toward the reasonable efforts expected of OCS.[39] But here the caseworker testified at the December 2017 trial that her work with Duke since she took over his case in August 2016 included only (1) inquiring of OCS's "family contact team to ensure that he was getting his quarterly visits with [Darrence]," (2) sending Duke "some correspondence regarding [Darrence's] needs," and (3) "one in-person meeting . . . at the Anchorage jail on February 3rd" during a visit. The caseworker also testified about Duke's need for a psychological assessment — a requirement of a different case plan — but explained she was unaware of any provider who would perform the assessment while Duke was in prison. The superior court noted its concerns with this issue, observing that "OCS didn't have a very good answer frankly as to why a mental health assessment of [Duke] had not been performed," and "[i]f this case turned solely on that, I would find against OCS."

---

[37] *See Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003) (noting that "failure to identify and offer programs to [the parent] before the planned termination would generally violate the state's duty" to make reasonable efforts).

[38] *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

[39] *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).

In *A.M. v. State* we affirmed an active efforts finding when the father received sex offender treatment in prison and the child protection agency "maintained contact with [the father] while he was in treatment, generally encouraged his treatment efforts, and assisted him in arranging visitation with his children."[40] In *Dashiell R. v State, Department of Health & Social Services, Office of Children's Services*, we affirmed an active efforts finding when the father received classes and therapy while incarcerated, "OCS staff communicated with [the father] during his incarceration," and "OCS arranged for written exchanges and telephone visits between [the father] and the children."[41]

In this case, OCS's efforts while Duke was imprisoned — at least as revealed by the evidence at trial — were less extensive than those we approved in *A.M.* and *Dashiell R.* While Duke did engage in parenting, vocational, and religious instruction while incarcerated, it was on his own initiative rather than in response to any guidance from OCS about what he needed to do to improve his chances of reunification. OCS's minimal engagement with Duke, combined with the lack of a relevant case plan, convince us it was clear error to find that OCS had made reasonable efforts toward reunification.

## V.    CONCLUSION

We REVERSE the termination of Duke's parental rights with respect to his son Darrence.

---

[40]    945 P.2d 296, 306 (Alaska 1997).

[41]    222 P.3d at 850.