NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KENDRA H., | ) | |
| | ) | Supreme Court No. S-17340 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-16-00097/98 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. 1765 – May 13, 2020 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Appellant. Laura E. Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A mother appeals the superior court's order terminating her parental rights to her two young children. The mother complied with the early stages of her Office of Children Services' (OCS) case plan, but due to learning difficulties failed to internalize

---

\*    Entered under Alaska Appellate Rule 214.

the teachings of parenting courses. As the case advanced the mother ceased engaging in her case plan and began missing visitation with her children. The mother suffers from depression and insomnia, and she has an erratic sleeping schedule that she claimed caused her to miss appointments. She did not act on referrals for services to address her insomnia, and she stopped receiving treatment for her depression.

The superior court terminated the mother's parental rights after finding her children in need of aid due to neglect and her mental illness. We conclude that (1) there was adequate evidence to sustain the superior court's neglect finding; and (2) the superior court did not err in concluding that OCS made reasonable efforts to reunite the family. We therefore affirm the superior court's order terminating the mother's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Events leading to state custody of the children

Kendra H. is the mother of Gia and Asher, currently ages six and three.[1] Gia's father is Robert Q., and Asher's is Peter M.[2]

In August 2016 Kendra lived at her mother's home. In September FBI agents came to the home and arrested Peter; he is currently in federal prison serving a six-year sentence for possession of child pornography. In October Kendra moved out of her mother's home and began living with friends, taking the children with her. OCS removed the children from Kendra's care in December 2016 because they "were suffering from chronic neglect."

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    Robert relinquished his parental rights to Gia before trial. Peter's parental rights were terminated at the same time as Kendra's. Peter has not appealed this order.

In its emergency children in need of aid (CINA) petition, OCS identified several reasons for concern. Asher's head was severely misshapen as an infant; his neck was twisted such that he held his head with his chin past his right shoulder, and he could not turn his head back to the left beyond the face-forward position. OCS alleged that this was the result of Kendra leaving Asher in his crib for extended periods with a bottle propped up for feeding; Kendra maintained that Asher was born this way. The home where Kendra was living after leaving her mother's home was described as "completely filled with mounds of garbage and household items." OCS received reports that Gia often appeared unbathed and dressed in dirty clothes. Other reports indicated that Kendra may have been off her prescribed medications, abusing alcohol, and using marijuana. Kendra was unemployed when the children were removed. OCS also suspected her of selling infant formula.

### 2. The children's needs

When Asher came into OCS care, he presented with a misshapen skull (plagiocephaly) and a weak or twisted neck (torticollis). He was fitted for a helmet in February 2017 that corrected his skull within six weeks. He was receiving weekly physical therapy as of July 2017, and by the termination trial in November 2018 he had "graduated from therapy" and was hitting his developmental milestones.

Once Gia came into OCS custody her mental health became a major concern. According to a February 2017 occupational therapy evaluation, Gia had impairments "related to toileting, self-feeding and social interactions." Gia's pediatrician also referred her for a neuropsychological evaluation to investigate a potential autism-spectrum disorder.

Neuropsychologist Dr. Jacqueline Bock performed this evaluation based on five sessions in May and June of 2017. Dr. Bock interviewed Gia's foster parents and court-appointed special advocate and administered cognitive tests to Gia. In these

interviews Gia was described as clumsy and as presenting significant deficits in social intelligence and emotional regulation. Dr. Bock diagnosed Gia with a speech sounds disorder and "Unspecified Trauma – Stressor – Related Disorder" that resulted in "[m]ild difficulty with daily functioning secondary to primary diagnoses and social/environmental stressors." Those stressors were "[o]ut of home placement and history of neglect, per report." Dr. Bock wrote that Gia "needs continued placement in a stable home, positive interactions with caring adults, structure, and guidance in learning appropriate behaviors."

Jill Hardee, a licensed clinical social worker, began providing therapy to Gia in October 2017. OCS referred Gia to Hardee based on reports that "[Gia] was struggling a lot with managing her emotions and her behaviors." Hardee initially diagnosed Gia with disinhibited social engagement disorder, an attachment disorder. This was based on several factors: Gia's inability to "discriminate around safety of others such as strangers," unspecified "verbal aggressive behaviors," and issues with sleeping and toileting.

Hardee stopped short of diagnosing Gia with a dissociative disorder, but Hardee was concerned that Gia had an imaginary friend, displayed significant mood fluctuations, and adopted "different emotional and tone of voice presentations." Hardee also testified that Gia was hypervigilant and that "her ability to regulate her nervous system is gravely impaired," making it difficult to care for herself, adjust to transitions from one activity to the next, and function at a basic level. Hardee attributed the various symptoms described above as due to a combination of Gia's attachment disorder and neglect.

### 3. Kendra's progress on her case plan

OCS prepared an initial case plan for Kendra in February 2017. The case plan contained two goals: (1) to "identify, develop, prioritize, and demonstrate the

knowledge and skills necessary" to meet her children's needs and (2) to develop coping skills and strategies to meet her own needs. Kendra's three designated activities were to complete a parenting course through South Central Parenting, obtain a mental-health assessment and follow any recommendations, and "engage in appropriate family contact."

### a. Parenting courses

Kendra registered for the required course with South Central Parenting in September 2017 but was discharged after missing the first two classes. Kendra re-enrolled in February 2018 and completed all seven sessions as well as some additional classes. Kendra was evaluated in four areas on a 5-point scale, scoring 3.7 in Participation, 3.9 in Openness, 2.2 in Show of Increased Understanding, and 1.8 in Show of Applied Learning.

Even before seeing the evaluation document, the OCS caseworker assigned to Kendra's case had concerns that Kendra had not developed adequate parenting skills or a full understanding of her children's needs; this was the basis for OCS's decision to seek termination of Kendra's parental rights.

### b. Mental health assessment

Kendra participated in the required mental health assessment in April 2017. Kendra was then referred for a neuropsychological evaluation, which she completed in November and December of 2017. Dr. Bock, who evaluated Gia, also evaluated Kendra.

Dr. Bock based her evaluation on interviews with Kendra and several diagnostic tests. Kendra's intellectual abilities were mostly in the average range, though she struggled with learning recall. Dr. Bock diagnosed Kendra with persistent depressive disorder (dysthymia); major depressive disorder (recurrent, severe, without psychotic features); social anxiety disorder; and insomnia. Dr. Bock concluded that Kendra's

"[d]epression and social anxiety, as well as insomnia" interfered with her daily living. Dr. Bock also stated that Kendra's naivete made her an easy mark for predators.

Dr. Bock made a number of recommendations; among those relevant to this appeal were outpatient mental-health counseling, discussing medication management with her doctor, and participating in a sleep study to address her insomnia.

### c.    Family contact

In August 2017 OCS stated that Kendra "rarely miss[ed] visits." But Kendra's mother testified that in the six months prior to the termination trial Kendra began missing visits. Originally Kendra was scheduled for one hour of visitation twice a week; she began missing morning visits, and eventually her visits shifted to a two-hour block once a week. Kendra apparently preferred this schedule.

### 4.    Other case-planning issues

Kendra's caseworker had limited contact with her, stating that Kendra had cancelled meetings and that they often missed one another's calls. Instead, they resorted to short, forced phone conversations. The caseworker felt that Kendra did not engage during their phone calls and observed that Kendra seldom asked about her children's condition.

The caseworker held a case planning meeting with Kendra and her attorney in July 2018. She testified that she discussed Dr. Bock's report with Kendra and there was an understanding of Dr. Bock's conclusions and recommendations at least to the extent of engaging in mental-health counseling, discussing medication management with Kendra's doctor, and participating in a sleep study. According to the caseworker,

Kendra engaged in counseling for about four months and did not pursue the sleep study or discuss medication management with her doctor.[3]

### B. Proceedings

OCS filed the petition to terminate Kendra's parental rights in August 2018. The court held a termination trial over two days, a month apart, in November and December.

Kendra was present for the first day of trial but not the second. On the second day, Kendra's mother testified that she had hosted Kendra the previous night to ensure that Kendra would make it to the trial on time; when the mother woke up, she learned that after she went to bed Kendra had gone out with a friend and had not returned. The mother reached Kendra, urged her to appear at the trial, and offered to pick her up, but Kendra insisted on calling in. Kendra did so for a time but then dropped off the line, apparently due to losing battery power on the phone she was using.

OCS did not call Dr. Bock as a witness. Instead it offered into evidence Dr. Bock's neuropsychological evaluations of Kendra and Gia. The court admitted Dr. Bock's neuropsychological evaluation of Kendra over the objection of Kendra's attorney, who asserted that the evaluation document was hearsay and likely contained secondary hearsay. The court ruled that any secondary hearsay contained within the document would be permitted only as background for Dr. Bock's opinion and admitted Dr. Bock's report as a certified business record.

The superior court made oral findings and an order on the record after the termination trial. The court recounted the testimony about Gia's diagnoses and

---

[3] Kendra apparently gave different explanations for her disengagement with counseling. She told her parents that she had accumulated $10,000 in bills and could no longer afford to attend. She told the caseworker that "she does not like the concept of someone telling her what she should do with her life."

exceptional need for stability, and it contrasted Gia's needs with Kendra's failure to maintain stable housing and her poor judgment in partnering with a sex offender (Peter) and allowing Gia's father to come to her home, which resulted in her eviction. The court credited Dr. Bock's assessment that Kendra is an "easy mark for predators," which endangers her stability as well as her children's safety. The court noted that despite engaging in parenting courses, Kendra earned low scores on her comprehension of that material; this indicated that she would be unable to "make the changes necessary in order to parent her child." Kendra's lack of stability was a "major concern" given that "[t]he children, especially [Gia], need stability." The court discussed Kendra's "very odd" behavior at the termination trial, and it noted her failure to utilize referrals for services to address her insomnia and mental health issues. After a review of the evidence, the court made findings with respect to each of the factors required for involuntary termination, and it terminated Kendra's parental rights. The court issued a written order memorializing its findings, conclusions, and order. Kendra appeals.

## III.   STANDARDS OF REVIEW

"We review factual findings in CINA cases for clear error, and '[w]e apply our independent judgment to questions of law.' 'Whether the superior court's factual findings satisfy applicable [CINA] statutes and rules is a question of law that we review de novo.' "[4] We conclude that "[f]actual findings are clearly erroneous if review of the

---

[4]     *Duke S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1127, 1132 (Alaska 2018) (alterations in original) (footnote omitted) (first quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008); and then quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013)).

entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[5]

"[W]hether OCS has made reasonable reunification efforts is a mixed question of law and fact."[6]

## IV.    DISCUSSION

The superior court could terminate Kendra's parental rights only after finding by clear and convincing evidence that (1) her children were in need of aid as described in AS 47.10.011; (2) Kendra had not remedied the conduct or conditions that placed her children at substantial risk of physical or mental injury; and (3) OCS made reasonable efforts to keep the family together.[7]    "OCS must also prove by a preponderance of the evidence that termination of parental rights is in the child's best interests."[8]    We review the superior court's findings only with respect to the first and third factors since Kendra does not challenge the superior court's other findings on appeal.

As to the first element, the court found that Gia and Asher were in need of aid under two separate sections of AS 47.10.011.  It found that Kendra subjected her

---

**[5]**    *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (alteration in original) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1264 (Alaska 2014)).

**[6]**    *Duke S.*, 433 P.3d at 1132 (quoting *Sherman B.*, 310 P.3d at 949).

**[7]**    AS 47.10.088(a)(1)–(3).

**[8]**    *Annette H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 450 P.3d 259, 265 (Alaska 2019); *accord* CINA Rule 18(c)(3).

children to neglect under AS 47.10.011(9)[9] and that Kendra's mental illness placed her children at substantial risk of physical harm or mental injury under AS 47.10.011(11).[10] In making these findings the court relied heavily on Dr. Bock's diagnoses of Kendra in her neuropsychological evaluation.

Kendra challenges the superior court's admission of Dr. Bock's neuropsychological evaluation. We decline to determine whether it was error to admit the evaluation because there is adequate evidence in the record to affirm the superior court's neglect finding without relying on Dr. Bock's report. We conclude the superior court did not err in finding that Kendra's children were in need of aid based on its finding of neglect. We also do not find error in the superior court's determination that OCS made reasonable efforts to reunite the family.

**A.    The Superior Court Did Not Clearly Err In Determining That The Children Were In Need Of Aid Due To Neglect.**

A court "may find neglect of a child if the parent . . . fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development,

---

[9]    AS 47.10.011(9) states that a court may find a child to be in need of aid if "conduct by or conditions created by the parent . . . have subjected the child . . . to neglect." Neglect exists when "the parent . . . fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so or offered financial or other reasonable means to do so." AS 47.10.014.

[10]    AS 47.10.011(11) states that a court may find a child to be in need of aid if "the parent . . . has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury."

though . . . offered . . . reasonable means to do so."[11] We find sufficient support in the record for the superior court to have found Kendra failed to provide adequate medical attention and "other care and control necessary" for her children's physical and mental health. The superior court therefore did not clearly err when it found the children in need of aid due to neglect.

As Kendra points out, OCS asks us on appeal to consider evidence of potential neglect that was not presented at the termination trial, namely that Kendra failed to adequately bathe, clothe, or feed her children. These facts appear only in OCS's emergency CINA petition and petition to terminate parental rights. Neither those documents nor the underlying facts at issue here were submitted at the termination trial. We agree with Kendra that documents and testimony "not properly admitted into evidence during the relevant hearing" cannot be relied on by the superior court and should not affect our analysis on review.[12]

Thus the superior court did not have competent evidence before it of Kendra failing to adequately clothe, bathe, or feed her children. The court acknowledged the fleeting mentions that Asher wore a helmet as a child but correctly disregarded this as part of its neglect analysis. Nor did the court have evidence before it that Kendra failed to provide adequate shelter for her children. While Kendra seemingly has a history

---

[11]    AS 47.10.014.

[12]    *See Bill S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 976, 983 n.32 (Alaska 2019) (rejecting OCS's attempt to bolster its documentation of active efforts by citing "pervasively in its brief to evidence that was *not* admitted at the termination trial and therefore cannot be relied upon by this court" (emphasis in original)).

of homelessness, this evidence was available only through the emergency CINA petition which was not offered at the termination trial.[13]

But the court did receive evidence that Kendra failed to provide Asher proper medical attention when she declined to take Asher to therapy for his head and neck issues. And there was ample evidence that Kendra's neglect of Gia played a strong role in Gia's continuing mental health issues. When Hardee first examined Gia, she diagnosed Gia with an attachment disorder. Gia had trouble sleeping; she experienced toileting issues; she displayed significant mood fluctuations; and she exhibited signs of significant anxiety making it difficult for her to exercise self-care and function on a normal level. Hardee described Gia as "always on guard," and she tied this behavior to Gia's anxiety and her inability to feel safe. Hardee diagnosed all of these symptoms as consistent with the neglect Gia experienced. Gia also "seemed to be overly concerned about caring for [Asher] . . ., as if she was in a caregiving role, which is often seen in siblings when there's an older . . . and . . . younger sibling and neglect from the parents."

Other testimony corroborated Kendra's neglect of her children. Kendra's mother testified that Kendra's sleeping patterns were "erratic." "Sometimes, she'll sleep until 2:00. . . . Sometimes, she'll stay up all night and sleep all day. It wasn't stable. It . . . didn't stay the same." This lack of stability was extremely harmful to Gia. Hardee spoke of Gia's almost "militant" need for structure "based on her inability to manage her own nervous system because she's so disregulated all the time." She noted, "Sleep is so crucial with these kids, so [is] a consistent bedtime routine." She explained how Gia's

---

[13] This is not the first appeal where a party attempts to rely on facts that were not admitted into evidence. *See, e.g.*, *id.*; *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013); *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 430 (Alaska 2012). Appellate counsel must be diligent to make sure that evidence relied on in the appellate briefs was actually admitted at trial.

need for structure extended even into holidays when schedules are typically less structured than during the school week. "[Gia's foster family] went to the movies, and [Gia] could hardly tolerate it. . . . [E]ven what you would think a child would enjoy and just be able to relax and engage in, she can't do that if — the change is too destructive."

Because the record showed that Kendra failed to provide adequate medical attention and other care necessary for her children's health and development, the court did not clearly err in finding Gia and Asher in need of aid under AS 47.10.011(9).

**B.** **The Superior Court Did Not Clearly Err In Concluding That OCS Made Reasonable Efforts To Reunite The Family.**

"Before terminating parental rights, the trial court must find by clear and convincing evidence that OCS made timely, reasonable efforts to provide family support services to the child and parents designed to prevent out-of-home placement or enable the safe return of the child to the family home."[14] "Reunification efforts need not be perfect; they need only be reasonable under the circumstances depending upon: . . . [the parent's] willingness to participate in treatment; the history of services provided by OCS; and the parent's level of cooperation with OCS's efforts."[15]

Kendra argues that OCS failed to make reasonable efforts to reunify her with her children. She principally cites *Duke S. v. Department of Health & Social Services, Office of Children's Services*[16] for the proposition that OCS only minimally engaged with her on her case plan and thus did not make reasonable efforts to help her. Kendra identifies four shortcomings: (1) failure to find alternative methods for Kendra

---

[14] *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1241 (Alaska 2015).

[15] *Id.* (footnotes omitted).

[16] 433 P.3d 1127 (Alaska 2018).

to learn after evidence emerged that she was not absorbing the teachings; (2) failure to adopt and give Kendra a written copy of a modified case plan based on Dr. Bock's recommendations; (3) inadequate efforts to schedule meetings with her; and (4) inadequate efforts to obtain an assessment of the children's bonding with her.

We find the analogy to *Duke S.* inapposite based on the facts of this case. OCS made reasonable efforts to help Kendra with issues identified in Dr. Bock's report. Moreover, while OCS certainly could have made better efforts in this case, the record shows its efforts were reasonable under the circumstances. The superior court did not clearly err in finding that OCS made reasonable efforts to reunite Kendra with Gia and Asher.

**1.     The analogy to *Duke S.* is inapposite, and OCS made reasonable efforts to schedule meetings with Kendra.**

In *Duke S.* we considered a superior court order terminating a father's parental rights to his autistic son.[17] The record in that case did not contain a case plan, and we noted that the lack of a case plan could be fatal in itself to a reasonable efforts finding.[18] We also observed that the OCS caseworker who took over that case met with the father only once in over a year and that OCS otherwise provided minimal guidance to the father as to how he could reunite with his child.[19] We therefore reversed the superior court because the record did not show by clear and convincing evidence that OCS made reasonable efforts to reunite the father with his son.[20]

---

[17]     *Id.* at 1130-32.

[18]     *Id.* at 1131, 1136.

[19]     *Id.* at 1136–37.

[20]     *Id.* at 1137.

The facts of this case differ from those in *Duke S.* Here, OCS prepared a case plan. And though it is true that OCS did not later formally adopt a new case plan, the caseworker discussed the new plan with Kendra along with Dr. Bock's neuropsychological evaluation. OCS also gave Kendra a copy of Dr. Bock's report.

The caseworker testified that she had three face-to-face meetings with Kendra and that she attempted to contact Kendra two more times to reschedule because they "either had to be rescheduled or [Kendra] did not show up." Kendra's attorney highlighted that OCS is supposed to have face-to-face meetings once a month, which did not happen in this case. But though OCS could have made additional effort to meet with Kendra, this does not mean that OCS did not make reasonable efforts to schedule meetings. When the caseworker did not have face-to-face meetings, she held them with Kendra over the phone. And there was sufficient evidence in the record for the superior court to conclude that Kendra was not interested in having these meetings. In addition to Kendra's cancellations, the caseworker testified that the telephonic meetings were short, that Kendra "was not really engaging" with her on the calls, and that Kendra sounded like she wanted to get off the phone. We must judge the reasonableness of OCS's efforts in light of this evidence, and unlike the situation in *Duke S.,* the superior court's finding of reasonable efforts here was not clearly erroneous.

**2. OCS made reasonable efforts to address issues identified in Dr. Bock's report and to help Kendra gain critical parenting skills.**

Kendra faults OCS for failing to "accommodate Kendra's learning style and help [her] understand her children's needs and absorb the material she was learning in the classes she attended." Dr. Bock's December 2017 evaluation indicated that "learning lengthier amounts of information is problematic" for Kendra, and Dr. Bock recommended teaching "in shorter amounts that are more frequently presented."

Dr. Bock also noted that "depression, anxiety, and fatigue can impair memory functioning and recalling learned information efficiently." Dr. Bock's diagnosis of Kendra's learning difficulties is consistent with Kendra's South Central Parenting scores that indicated a lack of understanding of the material and an inability to apply the teachings of that course. Kendra contends that the caseworker failed to "read Dr. Bock's report, meet with Kendra, and try and implement Dr. Bock's suggestions" prior to July 2018. By then, Kendra alleges, OCS had already made the decision to terminate Kendra's parental rights.

As a preliminary matter, we cannot say that Kendra's account of when OCS had the information before it is accurate. The South Central Parenting letter, for example, is undated. Kendra's excerpt of record assigns the date October 10, 2018 to the letter. But that places OCS's knowledge of the letter's contents after OCS's petition for termination. This undermines Kendra's argument that OCS did not follow through on critical information available to it prior to seeking termination.

The caseworker also spoke with Kendra about the report's recommendations. The report did not explicitly link Kendra's mental illness with her learning difficulties, but it suggested the two could be related. Dr. Bock noted, "It is hoped that with resolution of [Kendra's] difficulties [with her depression, anxiety, and fatigue] . . . her memory and organization will improve as a result." OCS referred Kendra to mental health counseling as per Dr. Bock's recommendation, but Kendra stopped going to counseling. OCS referred Kendra to a doctor to receive medication for anxiety and depression. Kendra did not follow up on this recommendation. OCS recommended Kendra obtain a sleep study to address her chronic insomnia; Kendra apparently did not follow up on this either. Though one can certainly question OCS for not following up on information in the report sooner, the evidence shows that OCS followed through on recommendations in the neuropsychological report, especially as

they pertained to Kendra's learning difficulty. That Kendra did not adhere to those recommendations does not show that OCS failed to make reasonable efforts to help her. On the contrary, the record shows that OCS's efforts were reasonable in light of Kendra's lack of willingness to participate in her plan and her level of cooperation.[21]

### 3. OCS made reasonable efforts with respect to the bonding study.

Kendra argues that the caseworker's failure to contact additional doctors about conducting a bonding study after the first doctor was unable to see her constituted a lack of reasonable efforts. The purpose of the study was to examine whether the children could be removed from the foster family's care and placed with Kendra. The caseworker initially contacted the only provider she knew. Once it became clear that this provider could not perform the study, the caseworker could have looked more broadly by contacting other OCS caseworkers in larger communities.

But there is a disconnect between the alleged failure of reasonable efforts and the principal issues in this CINA case. The children were in need of aid because of Kendra's inability to manage her fatigue and learn the skills she needed to safely parent both children together. The extent of Kendra's parental bonds with her children is secondary to these main issues. We therefore do not find error in the superior court's reasonable efforts finding with respect to the failure to seek additional providers for the bonding study.

## V. CONCLUSION

We do not identify clear error in the superior court's findings that Kendra's children were in need of aid and that OCS made reasonable efforts to reunite Kendra

---

[21] *See Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1241 (Alaska 2015)*.*

with her children.  We therefore AFFIRM the termination of Kendra's parental rights with respect to Gia and Asher.