TARA U., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–13720.

Supreme Court of Alaska.

Sept. 3, 2010.

---

Before: CARPENETI, Chief Justice, and FABE, WINFREE, and STOWERS, Justices.

## Order

**IT IS ORDERED:**[1]

1. Tara U. is the mother of Molly, born April 2003, and Maggie, born February 2006.[2] The girls' father is deceased. Molly and Maggie were both born with high levels of opiates in their systems. As a result, the State of Alaska Office of Children's Services (OCS) placed each of them directly after birth in the custody of their grandmother, Dalila, who shared a home with Tara. OCS provided Dalila with a care and safety plan after Maggie's birth. The plan specified that Tara was not to reside in the home and was not to have unsupervised contact with the girls, but Dalila did not follow the plan. OCS did not come to the home to follow up.

2. In July 2003 OCS received an unsubstantiated report that individuals in Tara's home were selling Oxycontin. In February 2006 Tara admitted that she was addicted to heroin.

3. On April 23, 2008, Tara was arrested and jailed for dealing heroin out of the home she shared with her children and Dalila. The police placed Molly and Maggie in emergency custody. This was the first time Tara's children had been taken into the legal custody of OCS.

---

1. Entered pursuant to Alaska R.App. P. 214.

2. We use pseudonyms throughout this order to protect the parties' privacy.

4. OCS filed an emergency petition for adjudication of the girls as children in need of aid and for temporary custody. In May 2008 the girls were placed with their paternal aunt, Sarah, and OCS gained temporary custody.

5. In June 2008 OCS assigned Stephanie Shields, a permanency social worker, to the case. Shields worked with a social worker at Hiland Mountain Correctional Center (Hiland), where Tara was being held, who looked into available substance abuse assessments offered at the jail. Tara chose not to participate in Hiland's assessment because she would have to pay a fee, and she believed she could receive an assessment for free after her release from jail. Shields did not offer for OCS to help pay for Hiland's assessment. Shields did not look into whether a mental health clinician worked at Hiland beyond asking the Hiland social worker whether services were available.

6. Tara was released from jail on bail to a third-party custodian in September 2008.

7. In an Order of Disposition issued in October 2008, the court committed the girls to OCS custody for up to two years. In February 2009, following a permanency hearing, the superior court determined that adoption was the appropriate permanent plan for the girls.

8. The court held a placement hearing in April 2009. OCS indicated its intention to have the girls adopted by their paternal cousin, Kate. Kate had participated in the girls' upbringing since their birth and hoped to adopt them. OCS planned to transfer the girls to Kate's custody when the school year ended. The aunt with whom the girls had been living chose not to be an adoptive placement because of her advanced age. The guardian ad litem (GAL) appointed for the girls testified that they wanted to go back to Dalila's, and presumably Tara's, care but that it was not in their best interests to go back. The court found that it was in the best interests of the children to be placed with Kate.

9. In June 2009 OCS filed a petition for termination of parental rights.

10. Tara returned to jail in July 2009 after allegedly violating a bail condition.

11. A new permanency social worker, Tamara Boeckman, was appointed on August 5, 2009, after Shields went on medical leave. Boeckman spoke with Tara on August 18 at Hiland, and Tara agreed to work a case plan. Boeckman sent Tara a packet for a telephonic substance abuse assessment. She determined that Tara was not eligible for Hiland's mental health assessment and would have to get one after she left custody.

12. The court held a termination hearing on September 3, 2009. At the February 2009 permanency and the September termination hearing, Shields testified that she had not met with Tara since her release from jail the previous September. She testified that she set up two appointments but Tara cancelled both because Tara "knew that her children should come first; however, right now she just needed to concentrate on her criminal case." Shields testified that she could not contact Tara because Tara left no number or address and Dalila claimed not to know how to find her. Shields testified that she chose not to look up the address of Tara's third-party custodian in the court file because Tara was not interested in working a case plan. The only times Shields saw Tara were at court proceedings. She did not attempt to go over Tara's case plan or provide her with referral information at those proceedings.

13. Shields further testified that she wanted Tara to complete a substance abuse assessment and mental health assessment. Tara occasionally called her, at which times Shields would ask Tara if she wanted to work a case plan. Shields testified that she "really wanted to be able to provide [Tara] whatever supports that she needed to be successful to address her needs in order to be able to parent," but that Tara "clearly stated … that she was not interested in case planning or being part of the case plan." She also testified that OCS would pay for a substance abuse assessment. She further testified:

> I kept offering and trying to engage [Tara]. But if she continued to say, I'm not interested, I can't force her to work a plan to get her kids back. But I kept making the door open and I kept offering her.

And any time that she would call and say, hey, I have, you know, this is going on with the visits, I certainly didn't hold that against her. I worked with her on that. So the door was definitely open. I kept, you know, asking if she wanted to work a plan, asking her if she was interested.

14. Tara testified at the termination hearing that initially she contacted Shields frequently but was discouraged by Shields's assertion that she would not get her children back. Tara testified that Shields was not helpful and did not provide her with information about mental health assessments or parenting classes. She testified that if her criminal case was resolved, she would work her case plan.

15. In an October 2009 Memorandum of Decision and Order the superior court, relying on testimony from both the permanency and termination proceedings, found that OCS proved by clear and convincing evidence that the girls were children in need of aid, that Tara had not remedied her conduct placing the children at substantial risk of harm, and that OCS had made reasonable efforts to provide remedial services. In evaluating whether OCS made reasonable efforts, the court took into account only the efforts made after OCS removed the girls from their home in April 2008. The court concluded that it could not take into account OCS's pre-removal actions. Despite Shields's failure to make reasonable efforts, the court found that OCS's overall post-removal efforts were reasonable because of Boeckman's later efforts and Tara's unwillingness to work her case plan.

16. The court made alternate findings that if it were legally able to consider OCS's entire history with the family, pre- and post-removal, then OCS failed to show by clear and convincing evidence that it made reasonable efforts.

17. The court also found that OCS proved by a preponderance of the evidence that termination of parental rights was in the best interests of the children. It balanced the harm that would arise from completely separating the girls from their mother, with whom they had a strong bond, against the girls' need for permanency and Tara's inability to provide it. It granted the petition for termination of parental rights.

18. Tara appeals the superior court's findings regarding reasonable efforts and best interests. Both OCS and the GAL argue that the superior court properly terminated Tara's parental rights.

19. We review a superior court's factual findings regarding termination of parental rights for clear error.[3] "[A] finding is clearly erroneous when a review of the entire record leaves us with a definite and firm conviction that the superior court has made a mistake."[4] We review de novo whether the superior court's findings satisfy applicable CINA statutes and rules, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[5]

20. A superior court must make four separate findings before terminating parental rights. In cases involving a non-Indian child, the court must find by clear and convincing evidence that (1) the child is a child in need of aid, as defined in AS 47.10.011;[6] (2) the parent has not remedied the conduct or conditions that placed the child at substantial risk of harm;[7] and (3) OCS has made reasonable efforts, as defined in AS 47.10.086, to reunify the child with the parent.[8] The court must find by a preponderance of the evidence that (4) termination of parental rights is in the best interests of the child.[9]

---

**3.** *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 717 (Alaska 2003).

**4.** *Id.* (quoting *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 650–51 (Alaska 2003)).

**5.** *Id.* (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**6.** AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

**7.** AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

**8.** AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

**9.** CINA Rule 18(c)(3).

**21.** Tara does not contest that the girls were children in need of aid and that she failed to remedy the conduct or conditions placing them at substantial risk of harm.

**22.** We hold that it was legal error for the superior court to consider only OCS's post-removal efforts in its examination of whether OCS made reasonable efforts. We have stated that "[t]he reasonableness of the state's efforts *'must* be viewed in light of the entire history of services that the state ha[s] already provided.'"[10] This history includes both pre-removal and post-removal efforts.[11]

**23.** Because the superior court made alternate findings based upon the record as a whole, we would normally uphold those alternate findings absent clear error. In this case, however, the findings do not permit effective appellate review.[12] In its two alternative conclusions, the superior court gave significantly different weight to the factors used in deciding whether OCS made reasonable efforts without explaining why the factors were weighted differently. When considering only the post-removal time period, the superior court found that OCS's efforts were reasonable. The court based this decision primarily on Tara's refusal to cooperate. It found that notwithstanding OCS's "dismissive approach," OCS's post-removal efforts were reasonable because "a case plan was actually prepared and provided to [Tara], and ... efforts were made to communicate with her," but Tara refused to cooperate. When determining that OCS's efforts over the entire history of the case were unreasonable, though, the court based its decision primarily on OCS's lack of effort; it found that Tara's unwillingness to cooperate "was a factor that the department simply was required to confront" and that OCS failed to put forth the required sustained effort and follow-through. Because of the unexplained apparent inconsistencies in the weight placed on OCS's efforts and Tara's unwillingness to cooperate, we cannot effectively review the findings regarding reasonable efforts.

**24.** We consequently vacate the order terminating Tara's parental rights and remand for reconsideration of whether OCS made reasonable efforts. In doing so, the superior court must consider the totality of the circumstances. It must look at OCS's entire history with the family, as well as the parent's level of cooperation with OCS's efforts, in determining whether OCS's efforts were reasonable.[13] It must consider whether OCS fulfilled AS 47.10.086(a)'s requirement that OCS identify and actively offer the parent family support services. OCS can fulfill this requirement "by setting out the types of services that a parent should avail ... herself of in a manner that allows the parent to utilize the services."[14] The superior court should not base its reasonable efforts findings merely upon a mathematical tallying of the efforts by OCS and the parent, but rather upon a consideration of the totality of the circumstances.

**25.** The superior court, in its discretion, may take additional evidence to support its

**10.** *Audrey H. v. State, Office of Children's Servs.,* 188 P.3d 668, 678 (Alaska 2008) (quoting *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 66 P.3d 1, 7–8 (Alaska 2003)) (emphasis added); *see also Neal M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 214 P.3d 284, 293 (Alaska 2009) (in evaluating active efforts required for ICWA case, "[c]ourts ... look to the state's involvement in its entirety" (internal quotations omitted)).

**11.** *See Audrey H.,* 188 P.3d at 678–81; *Erica A.,* 66 P.3d at 7–8.

OCS and the GAL also argue that Tara is precluded from protesting OCS's pre-removal efforts because she did not object to them during the adjudication proceedings. This argument fails because "nothing resolved at the adjudication stage foreclose[s] a parent from fully litigating all relevant issues at the termination stage." *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 209 (Alaska 2000).

**12.** *Cf. Park v. Park,* 986 P.2d 205, 210–11 (Alaska 1999) (findings in child custody case insufficient for effective appellate review because they forced supreme court to speculate as to what the superior court might have considered in making the findings).

**13.** *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 162 P.3d 1239, 1245 (Alaska 2007).

**14.** *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 77 P.3d 715, 720 (Alaska 2003).

factual findings regarding whether OCS made reasonable efforts.

■ 26. The superior court did not clearly err in finding that termination of Tara's parental rights was in the best interests of the children. It was not clear error for the court to find that Tara has not demonstrated an ability to properly care for the girls and that the permanency of an adoptive placement was in the girls' best interests.

27. We VACATE the superior court's order so far as it regarded OCS's reasonable efforts and REMAND for additional findings of fact based upon the totality of the circumstances.

Entered by direction of the court.

CHRISTEN, Justice, not participating.

FABE, Justice, dissenting.

FABE, Justice, dissenting.

I would affirm the superior court's decision to terminate parental rights. Although we have held that the trial court should look at the "entire history of the services that OCS has provided a parent" in deciding "whether reunification efforts during a specific time were reasonable," [1] it seems incorrect to conclude in this case that OCS's failure to make efforts prior to removal of the children could negate the reasonable efforts made to reunify the family after the children's removal. Here, Tara's utter lack of cooperation with OCS and her express refusal to work on her case plan provide ample support for the superior court's findings regarding the adequacy of OCS's reasonable efforts. As the trial court explained, "[h]ad [Tara] made the slightest gesture of cooperation, or even expressed some level of willingness to pursue treatment, the court might [have] balance[d] the factors differently." Even at the time of the termination trial, the trial court noted that it "ha[d] no evidence at all that [Tara was] serious about treatment."

Our rules expressly contemplate that an earlier failure to make reasonable efforts can be rectified by OCS. Even where the court finds that the Department has failed to make reasonable efforts to avoid out-of-home placement, such a failure "is not in itself a ground for returning the child to the home ... and does not affect the court's ability to proceed to adjudication." [2] Moreover, where "the Department has failed to make required reasonable efforts," the remedy is for the court to "postpone disposition until the court finds that reasonable efforts have been made." [3] And here, the trial court concluded that post-removal efforts were reasonable, particularly in light of Tara's refusal to cooperate.[4] Given that OCS made sufficient efforts to reunify the family after removal, those efforts are not diluted by the fact that earlier in the case, before the children were removed, fewer efforts were made. As the State points out, "[t]o hold otherwise would be to say that the longer OCS has failed to make efforts toward a family, the longer OCS would later have to make efforts in order to show that it has, on average, made 'reasonable efforts.'"

The trial court appropriately focused on Tara's complete failure to cooperate with the OCS case plan after her children were removed from the home. For this reason, I do not believe that the superior court committed any legal error, and I respectfully dissent.

1. *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 162 P.3d 1239, 1245 (Alaska 2007).

2. CINA Rule 10.1(a)(2).

3. *Id.*

4. See *Audrey H. v. State, Office of Children's Servs.,* 188 P.3d 668, 678 (Alaska 2008) ("A parent's demonstrated unwillingness to participate in treatment may be considered in determining the reasonableness of state efforts.").