NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DUKE S., | ) | |
| | ) | Supreme Court No. S-17833 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-14-00311 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1824 – April 14, 2021 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Chris Peloso, Juneau, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

I. **INTRODUCTION**

This case, involving the termination of a father's parental rights to his son, is before us for the second time. We reversed the superior court's first termination order

---

\* Entered under Alaska Appellate Rule 214.

on grounds that the Office of Children's Services (OCS) had failed to carry its burden of proving the son's child in need of aid (CINA) status and OCS's reasonable efforts toward reunification. On remand, after OCS filed a second petition to terminate the father's parental rights, the superior court again found that termination was justified. It found that OCS's case plan properly focused on encouraging the father to learn about his son's extraordinary special needs by communicating with his caregivers; that the father refused to do so; and that the father's intransigence posed a substantial risk of harm if the child were placed in his home. The father appeals the termination order, arguing that the court's critical findings were not supported by substantial evidence.

We conclude that the superior court's findings of fact were not clearly erroneous. We also conclude that the superior court did not err in deciding that the father did not belong to a federally recognized tribe for purposes of the Indian Child Welfare Act (ICWA). We therefore affirm the order terminating the father's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Darrence G., born in April 2014, is the child of Evangeline G. and Duke S.;[1] Duke has other children who are not involved in this case. OCS took custody of Darrence in July 2014 because of Evangeline's substance abuse issues; the identity of Darrence's father was unknown at the time. A paternity test established Duke's paternity in November 2014, but he was arrested a few months later and spent the next three years incarcerated, having little contact with Darrence. In December 2017, following a trial, the superior court terminated Duke's parental rights, finding that

---

[1]    We use pseudonyms for the biological and adoptive families to protect their privacy.

Darrence was a child in need of aid due to abandonment, parental incarceration, and neglect.[2]

Duke appealed.[3] While the appeal was pending, Evangeline voluntarily relinquished her parental rights and consented to Darrence's adoption by the foster parents who had been caring for him since his infancy. The adoption was finalized in February 2018. Nine months later we reversed the order terminating Duke's parental rights without commenting on the intervening adoption.[4]

## B. Proceedings On Remand

In January 2019, following remand, Duke moved to set aside the adoption decree. OCS responded by recommending that the court "leave the adoption intact, reopen the CINA case, grant the department supervision, allow the department to resume unification efforts with [Duke], and hold periodic status hearings to monitor progress." The court ultimately adopted OCS's position. The court reopened Darrence's CINA case, and OCS filed an amended CINA petition in April 2019, describing its rationale for continuing to treat Darrence as a child in need of aid. The court denied Duke's request to dissolve the adoption decree, deciding that it would remain in place until the CINA case was resolved.

## C. Darrence's Special Needs

Darrence had a number of special needs evaluations in 2019. A clinical psychologist with Alaska Psychological Services performed a neuropsychological

---

[2]  *See* AS 47.10.011(1), (2), and (9).

[3]  *Duke S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1127 (Alaska 2018). The background of this case is set out more fully in the published opinion. *Id.* at 1129-32.

[4]  *Id.* at 1137.

assessment and found that Darrence had significant learning and behavioral difficulties. She concluded that his "longstanding history of developmental delays, social skills delays, sensory sensitivities and behavioral dysregulation" met the criteria for autism spectrum disorder. A second clinical psychologist performed a psychological evaluation and reported that Darrence had "profound special needs," including "autism spectrum disorder, attention deficit hyperactivity disorder, . . . unspecified neurodevelopmental disorder, [and] fine motor/perceptual skill delays."

A speech therapist also evaluated Darrence and recommended that he receive "speech-language intervention 1-2 times per week due to the severity of the disorder and high level of expertise involved in designing and implementing a treatment plan." She recommended that "[a] home practice program will be used to supplement treatment activities but should not be considered a substitute for the required level of professional skill."

### D. OCS's Efforts Following Remand; Second Petition To Terminate Duke's Parental Rights

After reopening Darrence's CINA case in April 2019, OCS developed a case plan for Duke.[5] Its goals were that Duke "understand [Darrence's] special needs and cooperate in a recommended transition plan that is most therapeutic for [Darrence]" and that Duke "maintain a stable, safe, and healthy home for himself and his children." The case plan listed several activities that would help Duke achieve these goals, such as "work[ing] cooperatively [with] the school and any other agencies involved in order to meet his children's educational and mental health needs."

---

[5] In this case's first appeal, we concluded that a significant — and possibly determinative — deficiency in OCS's efforts preceding the first termination was the lack of any "case plan directed toward reunifying Duke and Darrence." *Id.* at 1136.

About six months later, in October 2019, OCS brought a second petition to terminate Duke's parental rights. The petition asserted that Duke had made no progress on his case plan, noting especially OCS's "significant concerns about [Duke's] ability and willingness to safely care for [Darrence] and meet his extraordinary special needs." The petition alleged that the assigned caseworker had encouraged Duke to work with Darrence's service providers to "gain[] knowledge of [Darrence's] extreme needs and insight into the type of parenting necessary to keep [Darrence] safe and healthy" but that Duke had "largely responded with belligerence and refusal to cooperate," and that "he continue[d] to be argumentative and threatening toward service providers" to the extent of "eventually driving them to refuse to work with him." OCS emphasized that Darrence would "likely need therapeutic services and supports for the rest of his life" and that "without proper care and consistent engagement in those services, [he was] at risk of serious physical and emotional damage."

### E.    The Termination Trial And Decision

The superior court held a trial over five days in March and June 2020. At the close of the evidence the court made detailed oral findings that supported termination of Duke's parental rights, concluding that the evidence on each of the elements was "not a close call." First, it found that Darrence was a child in need of aid due to abandonment, substantial risk of physical harm, and neglect. Second, it found that Darrence remained at risk of harm because Duke refused to work on his case plan, particularly its requirement that he learn about Darrence's extraordinary special needs so that he could be an effective caregiver. Third, the court found that OCS's reunification efforts were reasonable, particularly given Duke's resistance. And finally, the court found that the termination of parental rights was in Darrence's best interests.

Duke appeals.

## III. STANDARD OF REVIEW

"Whether a child is in need of aid, whether a parent has remedied the conditions that placed the child in need of aid, and whether termination is in a child's best interests are factual determinations."[6] "In a child in need of aid . . . case, we review a superior court's findings of fact for clear error."[7] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' "[8]

"Whether OCS has made reasonable reunification efforts is a mixed question of law and fact."[9] "Determining whether the superior court's findings comply with ICWA requirements is a question of law that we review de novo."[10]

## IV. DISCUSSION

Alaska Statute 47.10.088 sets out the findings a court must make before it may terminate parental rights:

> (1) the child has been subjected to conduct or conditions described in AS 47.10.011;

---

[6] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (footnotes omitted).

[7] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

[8] *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004) (footnote omitted) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 950 (Alaska 2000)).

[9] *Sherman B.*, 310 P.3d at 949.

[10] *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 431, 440 (Alaska 2013).

(2) the parent

    (A) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

    (B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and

    (3) the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts.[11]

The court must "consider the best interests of the child" when making these determinations.[12]

    Duke argues that OCS failed to meet its burden of proof for every factor and that the court failed to recognize his tribal membership, which would require applying the heightened standards of ICWA.[13] We conclude, however, that the court did not err in its findings of fact and that it properly applied the law in reaching its decision to terminate Duke's parental rights.

**A.    The Superior Court Did Not Err In Finding That Darrence Was A Child In Need Of Aid.**

    Before terminating parental rights, "the court must find by clear and convincing evidence that the child 'has been subjected to conduct or conditions described in AS. 47.10.011' and is thus in need of aid."[14] The superior court found this element to exist on three grounds: abandonment (AS 47.10.011(1)), neglect

---

[11]    AS 47.10.088(a).

[12]    AS 47.10.088(b) and (c).

[13]    25 U.S.C. § 1912(f) (2018).

[14]    *Sherman B.*, 310 P.3d at 949 (quoting AS 47.10.088(a)(1)).

(AS 47.10.011(9)), and substantial risk of physical harm (AS 47.10.011(6)). Duke argues that OCS failed to meet the burden of proof for any of the three conditions. We conclude that the court did not err by finding that Darrence was a child in need of aid. Because OCS must prove only one ground to satisfy AS 47.10.011,[15] we address only AS 47.10.011(6) — that Darrence was at risk of physical harm if returned to Duke's care.

Substantial risk of physical harm may be the basis of a child in need of aid finding if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by [their] failure . . . to supervise the child adequately."[16] Explaining its finding that Darrence faces a substantial risk of injury if placed in Duke's care, the court emphasized the child's extraordinary special needs, requiring "24/7 eyes-on, hands-on" care to keep him from injuring himself. Five witnesses at trial were health care professionals who had evaluated Darrence. All five testified that his needs were extensive and ongoing. The court pointed to the testimony of one psychologist in particular, who believed that Darrence required constant supervision because he often put "the wrong stuff in his mouth," like scissors and knives, was very impulsive, and reacted negatively when adults got angry with him.

The court contrasted the severity of Darrence's special needs with Duke's apparent indifference to them: "[W]hen he was being questioned, he couldn't even tell this court or the questioner what [Darrence's] needs were." The court explained that Duke had ignored Darrence's needs in the past and that all the evidence showed that he

---

[15]     *See Rick P. v. State, OCS*, 109 P.3d 950, 956 (Alaska 2005) (noting it is unnecessary to consider other findings if record supports one ground for finding child to be in need of aid).

[16]     AS 47.10.011(6).

would ignore Darrence's special needs in the future. As an example the court cited the testimony of a police officer. The officer testified that in May 2020, in the middle of the night, he responded to a call about a small child someone had spotted in a wetland area. The officer found Duke's six-year-old daughter — also reportedly autistic — wet, shivering, shoeless, and dressed only in her pajamas. Duke appeared about an hour later, said that he had been at the store, which was three to four miles away, and explained that "mistakes happen." He denied that his child had been alone for an hour — as shown by the police call records — insisting that it had been only 10 or 15 minutes.

Finally, the court found that Duke's own emotional volatility and short temper — evident throughout his dealings with OCS and in the court proceedings themselves — exacerbated the risk of harm to Darrence. The court observed, "I see no way at all that [Duke] could control himself in a way that [Darrence], of all people, needs — calm and consistent, understanding parenting."

Duke argues that the superior court's substantial risk of harm finding is not supported by the record. He focuses his disagreement on the court's conclusion that he does not "understand [Darrence's] special needs," arguing that there is ample evidence that he has taken "alternative steps to both understand and address his special needs children." Duke cites his own testimony that while incarcerated he took classes in parenting, working, and religion, all on his own initiative, and that he more recently earned a certificate for training to be a "supporting caregiver" to "individuals with mental and physical disabilities like [his] son." But the superior court specifically found Duke's claims to various kinds of caregiver training to be incredible: "[H]e has never produced any certifications. And this court finds that he's not credible as to any of that." We will

not second-guess the superior court's credibility determination[17] or "re-weigh evidence when the record provides clear support for the trial court's ruling."[18] The record clearly supports the superior court's findings that Darrence was at substantial risk of harm if not given appropriate care and that Duke was unlikely to give it. The superior court did not clearly err in this finding.

**B. The Superior Court Did Not Clearly Err In Finding That Duke Failed To Remedy The Conduct Or Conditions That Led To Darrence's Adjudication As A Child In Need Of Aid.**

Before terminating parental rights, the superior court must also find by clear and convincing evidence that

> (2) the parent
>
> > (A) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
> >
> > (B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury . . . .[19]

In explaining why this element was met, the superior court found that Duke had done nothing to assist Darrence with his special needs and had demonstrated by his "belligerence and refusal to cooperate" with OCS that he had no intention of doing better in the future.

---

[17] *Hockema v. Hockema*, 403 P.3d 1080, 1090 (Alaska 2017).

[18] *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008).

[19] AS 47.10.088(a)(2)(A) and (B).

Duke argues that this finding is not supported by the record. He asserts that because we reversed the superior court's finding that Darrence was a child in need of aid, OCS cannot establish that Duke failed to remedy his conduct; there was no conduct to remedy. But Darrence had been adjudicated a child in need of aid in 2014 "due to abandonment, physical harm, neglect, and [Evangeline's] substance abuse."[20] It was on the basis of that adjudication — made under a "preponderance of the evidence" standard of proof[21] — that Darrence was committed to OCS's care during the years that followed.[22] The termination order that we reversed in 2018 involved a higher standard of proof: "clear and convincing evidence that the child 'has been subjected to conduct or conditions described in AS 47.10.011' and is thus in need of aid."[23] The adjudication of Darrence's CINA status was not before us on appeal, and our decision did not purport to affect it.

Duke argues alternatively that he was not given enough time to remedy, noting that he "was only given seven months, from April 2019 to October 2019, to work on his case plan prior to [OCS's] filing of its second petition for termination." But by statutory definition, a "reasonable time" to remedy is "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and

---

[20]     *Duke S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1127, 1130 (Alaska 2018).

[21]     AS 47.10.011.

[22]     *See* AS 47.10.080.

[23]     *Duke S.*, 433 P.3d at 1132 (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013)).

developmental needs, and ability to form and maintain lasting attachments."[24] Given the strong evidence of Darrence's extraordinary special needs, in particular his need for stable and consistent attention, the superior court could reasonably conclude that seven months was enough time for Duke to demonstrate a sincere commitment to learning how to care for his child. The court's finding that Duke failed within a reasonable time to remedy the conduct or conditions that made Darrence a child in need of aid is not clearly erroneous.

## C. The Superior Court Did Not Err In Concluding That OCS Made Reasonable Efforts To Reunify The Family.

"When terminating parental rights, OCS must prove by clear and convincing evidence that it made 'reasonable efforts' to provide family support services designed to prevent out-of-home placement or enable the safe return of the child to the family home."[25] In reviewing whether OCS made reasonable efforts, a court considers OCS's efforts in their entirety.[26] "The court must first identify the problem that caused the children to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances."[27] "Moreover, we have affirmed

---

[24] AS 47.10.990(30).

[25] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1261 (Alaska 2010) (citing AS 47.10.086(a); AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A)).

[26] *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007) (stating that courts consider "the entire history of the services that OCS has provided a parent"); *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 77 P.3d 715, 720 (Alaska 2003).

[27] *Barbara P.*, 234 P.3d at 1262.

a finding that OCS made reasonable efforts overall even when its efforts were not reasonable during a particular period of time."[28]

The superior court found that OCS "provided timely, reasonable efforts to provide family support services to [Darrence] and to [Duke], designed to enable the safe placement of [Darrence] with [Duke]." Duke argues that this finding, too, is not supported by the record. He asserts that OCS's efforts after the November 2018 remand were "minimal and perfunctory" and that OCS created a "threadbare case plan" that focused only on connecting him with Darrence's service providers. He argues that once it became clear he "was reluctant to utilize those particular service providers," OCS should have tried something else, including making a better attempt to bridge the deep trust gap between him and OCS. Lastly, Duke contends that OCS never had any intention of working with him or making reasonable efforts to reunite his family, as the court found that it was "abundantly clear from the beginning" that OCS would be seeking termination again following remand.

"Whether OCS has made reasonable reunification efforts is a mixed question of law and fact."[29] We have held that "OCS must identify relevant support services that may aid the parent in remedying the relevant conduct or conditions and must actively help the parent to obtain those services."[30] "OCS can fulfill this requirement 'by setting out the types of services that a parent should avail . . . [himself]

---

[28]    *Id.*

[29]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013).

[30]    *Id.* at 952.

of in a manner that allows the parent to utilize the services.' "[31] "[OCS] has some discretion both in determining what efforts to pursue and when to pursue them."[32]

The court found that OCS fulfilled these requirements, and the record again amply supports this finding. The caseworker assigned to Darrence's case testified that she contacted Duke a number of times from April 2019 to June 2020 in an attempt to get him to engage with the case plan, but he rejected every overture. OCS had arranged a team of doctors and therapists to help care for Darrence, and it repeatedly encouraged Duke to get in contact with members of the team so that he could learn how to care for his son. But Duke refused to participate. It was within OCS's discretion to decide that Duke's engagement with Darrence's caregivers — thereby becoming educated about his son's extraordinary special needs and how to address them — was the key to reunification and should be prioritized. The court's finding that OCS made reasonable efforts to reunify Duke with Darrence is not clearly erroneous and satisfies the statutory "reasonable efforts" standard.

### D. The Superior Court Did Not Clearly Err In Finding That Terminating Duke's Parental Rights Was In Darrence's Best Interests.

"Under AS 47.10.088(c) and CINA Rule 18(c)(3), before a court terminates parental rights it must find by a preponderance of the evidence that termination is in the best interests of the child."[33] It is "proper to consider the children's bond to their

---

[31]     *Tara U. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 239 P.3d 701, 705 (Alaska 2010) (first alteration in original) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[32]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012).

[33]     *Sherman B.*, 310 P.3d at 954.

caregivers, their need for permanency and stability, and the potential risk to the children if returned to their parent's care."[34] "[A] child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[35]

The court found that it was in Darrence's best interests that Duke's parental rights be terminated. Emphasizing the enormous amount of energy and attentiveness it took to care for Darrence due to his special needs, the court predicted that the child would likely sustain serious emotional or physical damage if placed in Duke's care. Duke challenges these findings, arguing that "the court failed to provide any basis for this finding or an analysis of best interest factors," that there is no evidence that Darrence was harmed by Duke's conduct, and that there was no conduct that required remedy.

"[W]hether termination is in a child's best interests is a factual determination we review for clear error."[36] The court's essential finding in its best interests analysis — that Darrence is likely to be harmed if placed in Duke's care — has ample support in the record, as described above in section IV.A. We see no clear error in the superior court's best interests finding.

### E. The Superior Court Did Not Err By Concluding That ICWA Did Not Apply.

Children who are members of a federally recognized Indian tribe are subject

---

[34] *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d. 924, 933 (Alaska 2012).

[35] *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010).

[36] *Sherman B.*, 310 P.3d at 954.

to heightened protections under ICWA.[37] These include a heightened evidentiary standard for termination, a requirement that OCS use active efforts instead of reasonable efforts to reunify child and parent, and a requirement that OCS notify the child's tribe both of termination proceedings and of the tribe's right to intervene.[38]

Following remand, Duke submitted a document which the court interpreted as asking that it take "judicial notice of [his] tribal enrollment"; Duke asserted that he belonged to the Tchou Tchouma Tchoupitoulas tribe, based in Louisiana and allegedly recognized as a tribe by the City of New Orleans.[39] But the superior court decided that ICWA did not apply because Duke's tribe was not federally recognized. Duke challenges this determination; he does not dispute that ICWA applies only to members of federally recognized tribes,[40] but he argues that the court failed to adequately inquire as to whether his tribe fits that category.

---

[37]    25 U.S.C. §§ 1901-1963.

[38]    25 U.S.C. §1912(a), (d), (f); CINA Rules 18(c)(2)(B) and 19(d).

[39]    This document was apparently not accepted by the court for filing and does not appear in our record. When referring to the document's content, the parties cite their on-record discussions about it and Duke's claims about his tribal status made in conversations with two OCS workers, as relayed in a May 2020 adjudication petition.

[40]    *See* 25 U.S.C. § 1903(8) (defining "Indian tribe" for ICWA purposes as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary [of the Interior] because of their status as Indians, including any Alaska Native village as defined in section 1602(c) of Title 43"); *In re Dupree M.*, 97 N.Y.S.3d 680, 682 (N.Y. App. Div. 2019) (recognizing that "ICWA applies only to federally recognized tribes" but that New York had extended ICWA protections to any other tribe recognized by the state); *In re B.R.*, 97 Cal. Rptr. 3d 890, 894 (Cal. App. 2009) ("The tribe in question [under ICWA] must be a federally recognized Indian tribe, group, band, or community eligible for federal services provided to Indians.").

The superior court recognized the importance of the issue, discussing it at several hearings and, in an abundance of caution, making its findings on termination under the heightened standards ICWA requires. But Duke's lawyers and OCS all agreed on the record that Duke's claimed tribe was not federally recognized, noting that the Secretary of the Interior keeps a list of such tribes and Duke's tribe was not on it. Duke does not contend otherwise on appeal.[41] Evangeline's consent to adoption supported this concession; she represented that "to the best of [her] knowledge" Darrence was not eligible for membership in an Indian tribe and neither parent was a member of an Indian tribe. We conclude that the court did not err in its conclusion that ICWA did not apply.

## V.    CONCLUSION

We AFFIRM the superior court's orders.

---

[41]    The list of federally recognized tribes is published in the Federal Register. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462-67 (Jan. 30, 2020).