NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| SHEP W., | ) | |
| | ) | Supreme Court No. S-18273 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3PA-19-00050/ |
| v. | ) | 00051 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. 1915 – August 31, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, John C. Cagle, Judge.

Appearances: Claire De Witte, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

I. INTRODUCTION

A father moved back to Alaska after five years without contact with his children. The Office of Children's Services (OCS) had recently intervened in the children's lives because of reports that the mother was failing to supervise them and was

---

*  Entered under Alaska Appellate Rule 214.

abusing substances. The father took custody of the children under a safety plan for a short time, but the plan was unsuccessful and OCS placed the children in foster care. OCS created a case plan for the father, referred him to services, offered him visitation, and tried to stay in touch with him. But the father made no progress on his case plan and did not keep in touch with OCS. After about a year OCS petitioned to terminate the father's parental rights. The superior court granted the petition and the father appeals, contending that OCS did not make reasonable efforts to reunify him with his children. Because OCS's efforts were reasonable under the circumstances, we affirm the termination of the father's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Shep and Lacey are the parents of twelve-year-old Bailey and nine-year-old Brooke.[1] OCS received a report in February 2019 that Lacey was using drugs while caring for the children, failing to supervise them, and exposing them to domestic violence between herself and another person. Shep moved back to Alaska around this time. He told OCS he had not seen or spoken to the children in five years.

OCS held a team decision meeting after receiving the report and decided that Shep should care for his children under a safety plan with Lacey's help. But the safety plan was unsuccessful; according to OCS, it failed because Shep moved residences such that OCS could not inspect his home, changed his phone number so he could not be contacted, and refused drug testing. Brooke was scheduled for hair follicle drug tests in April 2019, apparently while in Shep's care, but she did not attend those appointments.

OCS filed a non-emergency petition for adjudication and temporary custody

---

[1]    We use pseudonyms for all family members to protect their privacy.

of both children in May 2019 after the safety plan failed; the children were nine and six years old at the time. The superior court found provisional probable cause and granted OCS temporary custody of both children. OCS then placed the children in a licensed foster home. It also assisted the foster parents by setting up Medicaid and providing clothing vouchers for the children. Both children were enrolled in counseling to work through their emotional challenges.

OCS obtained a hair follicle drug test for Brooke, who tested positive for methamphetamine, indicating exposure within approximately the past 90 days. Shep refused to take a hair follicle test himself, later telling the assigned caseworker that Brooke's positive result made him "look bad." OCS referred Shep to additional drug tests as the case progressed, but he missed all of them.

OCS created case plans for each parent at the end of May 2019. Both parents signed their case plans, indicating that they read and understood them. Activities listed on Shep's case plan included completing an integrated mental health and substance abuse assessment, filling out releases of information, taking random drug tests, participating in a parenting course, engaging in visitation with his children, finding a stable job, participating in social activities with his sober supports like friends and family, meeting with the assigned caseworker no less than once per month, and updating OCS with any changes in his contact information. Lacey's case plan was functionally identical. OCS made referrals to the identified services, held administrative case reviews every six months, and conducted multiple case plan evaluations. While OCS attempted to contact and meet with Shep regarding his case plan, he was often unresponsive, and he made little to no progress on any of his case plan activities. He also regularly missed court hearings, and on multiple occasions his attorney was unable to take a position on his behalf.

OCS offered both parents visitation with the children. Early on Lacey

attended her visits with some consistency, though her attendance became inconsistent as the case progressed. Shep's visitation was never consistent. He repeatedly failed to attend the visitation supervisor's mandatory orientation for parents. Later in the case Shep participated in some video and phone visits supervised by the foster family, but his attendance was "sporadic and mostly consist[ed] of no-shows." Shep never explained his inconsistent attendance. According to the children's foster mother, Shep's last contact with the children was in November 2020.

During this time period the matter was assigned to a new caseworker. The foster mother testified that the new caseworker visited the foster home "religiously, monthly" and was "the best case worker [she] ever had." The caseworker tried to get in touch with Shep by texting him, calling him, and sending letters to his last known addresses.

At one point, in April 2021, Shep called into a court hearing and provided the caseworker a new phone number. Using that number the caseworker contacted him and scheduled a face-to-face meeting. She offered Shep a cab voucher, but he declined and assured her he would be able to attend. However, Shep never showed up, and she was unable to reach him again.

OCS tried to get a physical address from Shep throughout the case, but he consistently declined to provide one. And once the caseworker learned that Shep had been charged with violent crimes in August 2021, the caseworker no longer felt comfortable meeting at his home. She explained that she would have offered Shep cab vouchers to meet at the OCS office, but she could not reach him.

B.    Proceedings

In September 2020 OCS filed a petition to terminate Shep's and Lacey's

parental rights because of abandonment, domestic violence, and substance abuse.[2] That month Shep attended a court hearing and stated that he intended to contest termination. The court scheduled trial for March 2021.

As the trial date approached, OCS moved for a continuance because it had trouble locating both parents to serve the petition. Shep attended the next hearing, in April 2021, and acknowledged service via email. But OCS still could not locate Lacey. The court scheduled trial for August 2021 and allowed OCS to serve Lacey by publication.

Trial began as scheduled, with the parties participating telephonically. Shep was present, but Lacey was not. When the court asked whether the parties were ready to proceed, Shep's attorney explained she had learned that Shep was scheduled for surgery later that day. The court then inquired directly with Shep about details; Shep told the court he learned about the surgery earlier that day and he was scheduled to have it a couple of hours later. The court decided to begin trial and take evidence until he needed to leave.

OCS began its presentation by calling the assigned caseworker. About an hour into the caseworker's testimony, Shep abruptly left the hearing. The court allowed Shep's attorney two opportunities to get in touch with him, but she was unable to do so. His attorney agreed that OCS could proceed with its presentation. After the caseworker finished testifying, OCS presented evidence from the children's foster mother, admitted documentary evidence, and rested its case. The court then ordered Shep's attorney to retrieve all records related to Shep's purported surgery. The caseworker asked whether Shep's attorney could provide his updated contact information; Shep's attorney explained that she needed his authorization, but she anticipated "being able to provide

---

[2]     AS 47.10.011(1), (8), (10).

at least a phone number."

When the court convened telephonically for the continued trial date in October 2021, Shep was not present. Shep's attorney explained that she had anticipated him calling in but he had symptoms of COVID-19 and "sounded pretty terrible the last couple of days," when she had contacted him to remind him of trial. She also acknowledged that Shep's alleged surgery on the prior trial date had not actually happened. After providing Shep's attorney multiple ultimately unsuccessful opportunities to contact Shep, the court found no good cause to continue the trial any further.

Because Shep had not begun his presentation, the court allowed OCS to re-open its case to present additional evidence. OCS again called the assigned caseworker, who testified both about Shep's false surgery claims and his recent lack of progress on his case plan. When OCS rested the court allowed Shep's attorney one more opportunity to contact him because she hoped to call him as a witness. However, she still could not reach him, so she presented no further evidence.

After closing arguments the superior court issued an oral ruling on the record. Among other findings and conclusions, the court determined "by clear and convincing evidence that [OCS] complied with the provisions requiring reasonable efforts." The court noted that OCS made an initial safety plan, created case plans for the parents listing services such as an integrated assessment and drug testing, held regular meetings, set up services for the children, and reminded parents about court hearings and meetings. But the safety plan "turned out to be futile," Shep had "not appeared for any drug testing," and "[n]either parent visited the children consistently at all in pretty much nearly a year." The court also noted that Shep "clearly exhibited a lack of willingness to engage in the treatment and the case plan." The court followed its oral ruling with a written order terminating Shep's and Lacey's parental rights.

Shep appeals the superior court's reasonable efforts determination. Lacey is not participating in the appeal.

## III. STANDARD OF REVIEW

" 'Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.' 'When reviewing mixed questions . . . we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[3] In doing so "[w]e bear in mind at all times that terminating parental rights is a drastic measure."[4]

## IV. DISCUSSION

Before terminating parental rights, the superior court must determine that OCS made "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home."[5] "These efforts must include '(1) identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid' and '(2) actively offer[ing] the parent . . . and referr[ing] the parent' to these services."[6] "OCS can fulfill this requirement 'by setting out the types

---

[3]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014) (footnote omitted) (first quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012); and then quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[4]     *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019) (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[5]     AS 47.10.086(a); AS 47.10.088(a)(3).

[6]     *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382
(continued...)

of services that a parent should avail . . . h[im]self of in a manner that allows the parent to utilize the services.' "[7]

"In reviewing whether OCS made reasonable efforts, a court considers the state's reunification efforts in their entirety. The court must first identify the problem that caused the children to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances."[8] "[A] parent's participation or lack thereof is relevant to the scope of efforts that OCS must make,"[9] and OCS "has some discretion both in determining what efforts to pursue and when to pursue them."[10] "The efforts that OCS makes must be reasonable but need not be perfect."[11]

OCS's efforts in this case included conducting a relative search; arranging supervised visitation with the children; providing clothing vouchers for the children; enrolling the children in counseling; creating a case plan for Shep after meeting with him to solicit his input; referring Shep to services and drug testing as identified in the case

---

**6** (...continued)
P.3d 1154, 1164-65 (Alaska 2016) (alterations in original) (quoting AS 47.10.086(a)(1)-(2)).

**7** *Tara U. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 239 P.3d 701, 705 (Alaska 2010) (first alteration in original) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

**8** *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010) (footnote omitted).

**9** *Joy B.*, 382 P.3d at 1166.

**10** *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 432 (Alaska 2012).

**11** *Id.* (quoting *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008)).

plan; evaluating Shep's progress toward the case plan goals on a regular basis; visiting the children at their foster home; attempting to stay in touch with Shep by emailing, calling, texting, and sending letters to his last known addresses; reminding Shep of upcoming court hearings; scheduling at least one face-to-face meeting with Shep; and offering Shep transportation assistance.

Despite these efforts Shep made no documented progress on his case plan. He missed all of his drug tests; did not engage with service providers; only sporadically attended supervised visits with the children; never reached out to the foster mother to request visitation; changed addresses and did not provide OCS updated contact information; consistently refused to give his physical address to OCS; and attended only a limited number of court hearings throughout the case. He also failed to keep in contact with OCS, despite having contact information for the assigned caseworker. And during the termination trial, Shep told the superior court he needed to leave early because he had an emergency surgery scheduled, but apparently did not have surgery scheduled at all.

Shep argues that the superior court erred by determining OCS made "reasonable efforts because (1) OCS failed to develop a case plan that addressed [his] unique needs and potential for reunification, and (2) OCS made insufficient efforts to contact [him]." OCS responds that its efforts were reasonable as a whole despite any imperfections, especially in light of "Shep's demonstrated disinterest in engaging with OCS and with his children."

Shep first faults OCS for creating "the exact same case plans for" both himself and Lacey. The parents' case plans were largely identical but differed in certain limited respects, such as listing examples of activities Shep might enjoy but not doing so for Lacey and including individualized protective factors for each parent. Although Shep's case plan was substantially similar to Lacey's, this does not render Shep's case

plan unreasonable under the circumstances.[12]  Shep had only recently reappeared in his children's lives after a five-year absence, leaving OCS with limited initial information about his needs.  OCS was, however, aware that Brooke had tested positive for methamphetamine, which supported its concerns about potential substance abuse.  Had Shep followed up with any activities listed on his case plan, OCS could have better understood his needs and tailored an updated case plan accordingly.  But Shep never followed up; he did not obtain an integrated assessment, he missed all his drug tests, and he regularly failed to respond to or keep in touch with the assigned caseworker.  Because OCS laid out services for Shep "in a manner that allow[ed] [him] to utilize the[m]"[13] and exercised reasonable discretion in determining what services to pursue,[14] the similarity of the parents' case plans does not render OCS's efforts unreasonable.

Shep next contends the superior court erred in concluding that OCS's efforts were reasonable because OCS "failed to maintain adequate contact with [him]." He raises three specific critiques of OCS's communication efforts:  (1) caseworkers never visited him in person at his residence; (2) caseworkers did not help him obtain a phone or other more reliable means of contact; and (3) caseworkers failed to reach out to him through alternative means like social media and relatives.  While we have endorsed — but not mandated — the use of similar methods under certain circumstances

---

[12]     *See Barbara P.*, 234 P.3d at 1262 ("OCS's efforts [must be] reasonable in light of the surrounding circumstances.").

[13]     *Tara U. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 239 P.3d 701, 705 (Alaska 2010) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[14]     *Sherman B.*, 290 P.3d at 432.

in the active efforts context,[15] these alleged deficiencies do not undermine the superior court's reasonable efforts determination in this case. Perfection is not the standard, nor is the standard one of active efforts in this matter; instead, OCS's efforts "must be reasonable."[16] Shep knew what was expected of him: he signed his case plan, which included contact information for the assigned caseworker, and he knew he was expected to stay in touch with OCS. Yet he consistently failed to do so, even when caseworkers attempted to contact him by email, text, phone, and through his attorney. Shep also never provided OCS with his physical address, despite multiple requests from caseworkers. Ample evidence supports the superior court's unchallenged factual finding that Shep "clearly exhibited a lack of willingness to engage." Considering the "reunification efforts in their entirety,"[17] we agree with the superior court that OCS met its reasonable efforts obligation.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Shep's parental rights.

---

[15] *See Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 902-03 (Alaska 2021) (noting that OCS made active efforts during portions of the case, including contacting people who knew parent to get in touch with him, and suggesting that efforts may have been improved by reaching out on social media earlier); *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1022 (Alaska 2009) (describing OCS's efforts as including contacting parent's relatives to search for parent).

[16] *Sherman B.*, 290 P.3d at 432 (quoting *Audrey H.*, 188 P.3d at 678).

[17] *Barbara P.*, 234 P.3d at 1262.